UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

JOHN A WALTER,                          )
                                        )
              Plaintiff,                )
                                        )
       v.                               )          Case No. 4:09-CV-15 JD
                                        )
WAL-MART STORES INC.,                   )
                                        )
              Defendant.                )

## MEMORANDUM OPINION AND ORDER

On February 23, 2009, Plaintiff, John A. Walter ("Walter"), filed a complaint in this Court. [DE 1]. Therein, Walter alleges that Defendant, Wal-Mart Stores Inc. ("Wal-Mart"), failed to make reasonable accommodations and terminated his employment in violation of the Americans with Disabilities Act ("ADA") [DE 1 ¶¶ 31-36] and in violation of an Indiana Civil Rights law prohibiting disability discrimination in employment. [DE 1 ¶¶ 37-41] . On June 3, 2010, this case was reassigned to the undersigned for all purposes. On September 29, 2010, Wal-Mart filed a motion for summary judgment against the complaint. [DE 46]. On November 30, 2010, Walter filed a response in opposition. [DE 48]. On December 20, 2010, Wal-Mart filed a reply. [DE 49].

Wal-Mart's motion for summary judgment construes Walter's Count I as incorporating both a failure to accommodate and a disparate treatment claim under the ADA, and this Court agrees. Because Walter has failed to show that a triable issue exists with respect to a threshold requirement common to both types of claim, summary judgment with respect to Count I as a whole must be **GRANTED**. Because Walter has failed to establish a jurisdictional basis for this Court to hear his state law disability claim, Count II must be **DISMISSED** without prejudice.

## I.  STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any such material fact, and summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* On the other hand, where a factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences her favor. *Anderson*, 477 U.S. at 255; *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). Still, the non-moving party cannot simply rest on the allegations or denials contained in its pleadings. It must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Furthermore, the non-moving party may rely only on admissible evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009).

## II.  FACTUAL BACKGROUND[1]

The Court provides both versions of some contested facts in light of the special significance factual disputes acquire in the summary judgment context. The inclusion of a certain version of a disputed fact in this section does not suggest that the Court relied on that version in reaching its conclusions. When ruling on a motion for summary judgment, the Court construes all facts in the light most favorable to the non-movant. Here, that means the Plaintiff, and all reasonable and justifiable inferences are drawn in his favor. *Anderson*, 477 U.S. at 255. Nor does the inclusion of a fact in this section guarantee that it was material to the Court's ruling on this motion, particularly given the highly specific nature of the grounds on which the motion is granted. Indeed, most of these facts prove immaterial. This section is simply intended to provide a comprehensive background of the case and of the evidence presented to the Court.

### Walter's Employment at the Fishers Location

On or around March 22, 2007, Walter began work as a People Greeter ("Greeter") at the Wal-Mart location in Fishers, Indiana. [DE 46-20 at 30, 44]. Throughout his employment with Wal-Mart, and throughout most of his life, Walter has had Friedreich's Ataxia, a progressive neurological condition which imposes a number of restrictions on Walter's life activities and work abilities. [DE 46-12; DE 46-20 at 85, 149-55]. For instance, Walter is unable to walk or stand and, instead, ambulates by wheelchair. [DE 46-12 at 2]. In addition, Walter has limited coordination and strength in his hands, restricting his ability to perform fine motor activities, such as operating a cash register. [DE 46-12 at 4-6; DE 46-20 at 164]. Similarly, Walter has further manual limitations which restrict his ability to reach at heights above his wheelchair and limit Walter's ability to push and pull manual

---

[1] The record is cited in the following format: ["Docket Entry Number" at "page or paragraph number within docket entry"]. No internal page or line numbers will be referenced.

3

pallet jacks. [DE 46-12 at 2, 4]. Finally, Walter also has severely restricted vision, which prevents him from reading documents without the aid of specially-engineered magnification devices. [DE 46-20 at 11, 25, 85, 150, 152].

According to the Greeter job description, which Walter signed, one of the job responsibilities was "provides requested assistance with merchandise returns". [DE 46-20 at 53-56; DE 46-4 at 20; DE 46-8 at 4-5; DE 46-5 at 7-9, DE 46-6 at 2]. Paul Askins, an Assistant Manager at the Fishers location, estimated that Greeters spent somewhere between ten and twenty-five percent of their work time handling returned merchandise. [DE 48-5 at13-14]. In addition, "using fine motor skills, including grasping, turning, and manipulating while marking returned items" was designated as an essential function of the job. [DE 46-4 at 20].

When Walter began working at the Fishers store, Greeters assisted with returns by placing a pink sticker on returned merchandise and then directing customers to the customer service desk. [DE 46-20 at 53, 59-64; DE 46-3 at 5]. However, the pink-sticker procedure resulted in significant fraud and shrinkage to Wal-Mart. [DE 46-14 at 32; DE 46-20 at 54, 75-78; DE 46-13 at 4-7; DE 46-3 at 5]. As a result, Wal-Mart modified its return process by implementing the Express Refund Program. [DE 46-14 at 32; DE 46-13 at 4-7; DE 46-3 at 5]. Most significantly, the Express Refund Program replaced the use of pink-stickers with the use of a Telxon, a hand-held scanner which printed merchandise-specific labels. [DE 46-20 at 54, 67-75; DE 46-13 at 4-5; DE 46-5 at 11-15; DE 46-3 at 5].

Sometime in 2007, before fully implementing the Express Refund Program, Wal-Mart tested the Telxon device at several of its stores, including the Fishers location. [DE 46-13 at 4-5, 8; DE 46-3 at 5-6; DE 46-20 at 54, 64-67]. Walter, however, did not have to use the Telxon during the trial

4

period. [DE 46-20 at 65-66; DE 46-13 at 9, 12-14]. After a short test period, the Fishers store returned to the pink sticker process. [DE 46-20 at 54, 66-67].

### Walter's Employment at the Lafayette Location

On November 23, 2007, Walter transferred to the Wal-Mart Store in Lafayette, Indiana. [DE 46-20 at 28-29; DE 46-4 at 12; DE 46-3 at 2, 4-5; DE 46-5 at 6]. When accepting this transfer, Walter confirmed that he could perform the essential functions of the Greeter position. [DE 46-3 at 4-5, 41]. When Walter began working at the Lafayette store in November 2007, Greeters still used pink stickers to assist with returned merchandise. [DE 46-20 at 54, 67]. However, because Wal-Mart's test of the Express Refund Program proved effective in reducing fraudulent returns, in late February and early March 2008, Wal-Mart began implementing the Program at numerous stores, including the Lafayette location. [DE 46-14 at 32; DE 46-16 at 2-3; DE 46-20 at 67; DE 46-5 at 11-14; DE 46-3 at 5-6].

From this point forward, every Greeter at the Lafayette location was expected to use the Telxon to process returns. [DE 46-14 at 32; DE 46-20 at 75; DE 46-16 at 2]. Indeed, Wal-Mart maintains that it now considers using the Telxon to be an essential function of a Greeter's job. [DE 46-14 at 323; DE 46-3 at 7; DE 46-5 at 10]. Accordingly, upon implementation, all Greeters at the Lafayette store received training regarding use of the Telxon, prior to implementation. [DE 46-20 at 67-69; DE 46-5 at 13-14; DE 46-17 at 2]. As part of this training, Walter attempted to use the device for three or four days but was unsuccessful. [DE 46-20 at 69-72, 78-79]. In particular, Walter had difficulty seeing the buttons and typing the requisite information into the keypad. [DE 46-20 at 72, 80-81]. However, potentially evidencing Wal-Mart's confusion regarding Walter's actual difficulties, Store Manager, Lakeia Giles ("Giles"), testified that Walter's difficulties also included

5

being able to hold the Telxon device. [DE 46-5 at 15, DE 48-3 at 12-13]. As a result, following the training, Walter told Assistant Manager, Kristine Emerick ("Emerick"),  that he doubted his ability to use the Telxon. [DE 46-20 at 67-69; DE 46-5 at 4].

Some time later, after Walter's difficulties were brought to Giles's attention, Walter asked Giles to allow him to revert back to the pink-sticker process for returning merchandise. [DE 46-20 at 67-69, 80-87; DE 46-5 at 4-5, 19-20]. At the time, Giles did not comment on the feasibility or reasonableness of Walter's request, explaining that Wal-Mart's Accommodation Services Center (frequently referred to as "the home office") would make the decision regarding Walter's request. [DE 46-5 at 19-20]. Wal-Mart now states, however, that, although Wal-Mart was waiting on information before considering Walter's requested accommodation, it now considers that particular accommodation to be "inconsistent" with the essential functions of the Greeter position and would have required a "change" in the those functions. [DE 46-14 at 31-33; DE 46-3 at 7]. Walter additionally states that he made requests for transfer to a different position at the Lafayette store. [DE 46-20 at 133-34; 136-37; 141; DE 46-4 at 40]. Specifically, Walter states that he inquired about jobs in the sporting goods and electronics department. [DE 46-20 at 163-64]. However, Walter did not apply for any vacant positions and could not identify any available positions at that time. [DE 46-20 at 138, 140, 163-64; DE 46-4 at 40].

### Disparate Treatment at the Lafayette Location

In addition to the foregoing, Walter also began to notice what he perceived to be disparate treatment during his tenure at the Lafayette location. Walter claims that his schedule was changed more frequently than the other non-disabled Greeters at Wal-Mart's Lafayette location. [DE 48-2 at 8]. Further, Walter claims that Emerick and Morgan Miller ("Miller"), a manager and personnel

6

specialist at the Lafayette location, respectively, sometimes commented on his disability, referring to him as "crippled," or calling him "worthless" or "pathetic, loser".  [DE 48-2 at 4-8].

### Walter's Accommodation Request Under Wal-Mart's ADA Policy

Under Wal-Mart's written ADA policy, an employee makes an accommodation request by notifying a manager, either orally or in writing, that he needs an adjustment or change at work on account of a disability. [DE 46-5 at 20-21; DE 46-6 at 7-8]. Thereafter, employees would be required to either confirm their request in writing or document the request on a "Reasonable Accommodation form". [DE 46-5 at 22-23, DE 46-6 at 7-9]. This form would then be sent to the ADA Coordinator at Wal-Mart's Accommodation Services Center. [DE 46-5 at 22-23; DE 46-7 at 2]. Thereafter, according to the written policy, the Accommodation Services Center monitored the interactive process for compliance and provided the facility Manager (the Store Manager or Co-Manager) with guidance in making the decision regarding the employee's request for a reasonable accommodation. [DE 46-7 at 2-3; DE 46-8 at 6-14].

The written ADA policy states that the facilities manager had ultimate decision making authority to craft and grant a reasonable accommodation. [DE 46-6 at 8-11]. For instance, the written policy instructed facility managers to notify employees that the facility manager will make the decision regarding the employee's accommodation request within 15 days. [DE 46-6 at 8-9]. In addition, the written policy provided specific actions for the facility manager to take with respect to documenting the facility manager's decision, notifying the employee, and following up with the Accommodations Service Center. [DE 46-6 at 10-11]. However, evidencing potential disparities between Wal-Mart's ADA written policy and the actual practice and potentially evidencing some confusion over who had final decision making authority with respect to Walter's request, Giles

testified that Wal-Mart managers deferred all decision-making responsibilities regarding an employee's accommodation request to the Accommodations Service Center, waiting for the home office to make the ultimate decision rather than merely looking to the home office for guidance. [DE 46-5 at 22-23, 43-44; DE 48-3 at 20-28; DE 46-14 at 13]**.** For instance, Giles states,

> [t]he interactive process that we have, we disclose the request information out, and we submit to ADA, and from that point, we just wait for a response back from them which direction we are to go in. We don't make the determining factor at store level. We submit the information to them and they get back to us and let us know which direction we need to go in.

[DE 46-5 at 23].

In addition, there appears to be similar discrepancies between Wal-Mart's written ADA policy and the actual practice with respect to requesting medical documentation from the employee. For instance, the written policy states that the facility manager has the authority to decide whether medical documentation is needed and to request the same from the employee. DE 46-6 at 9-10 ("If the facility manager decides that medical documentation is required, the Associate will be asked to provide documentation from their health care provider"). However, Giles testifies that the authority to make this determination, whether medical documentation was needed, rested solely with the Accommodations Service Center. [DE 48-3 at 20-28; DE 46-14 at 27-31; DE 46-7 at 2]. For example, Giles testifies,

> Q. You have the option of requesting medical information; correct?
> A. We, at store level, don't have that option. ADA has that option. The ADA will make a request for medical information. The only thing we do, as far as that is concerned, is if ADA calls us and says are you able to contact the associate, if they are unable to be reached, and we try to get the information they need to submit, to continue with the proceedings.

[DE 48-3 at 21-22].

Walter similarly admits some confusion regarding Wal-Mart's ADA policy, admitting that

8

he took a training course regarding the policy during orientation but claiming that he actually understood little about the policy and did not know how to make an ADA complaint. [DE 46-20 at 31-32, 34-38, 42-43, 45-49; DE 46-4 at 13-19; DE 46-3 at 4, 37, 39].

On March 3, 2008, Giles met with Walter and assisted him with completing a Wal-Mart Reasonable Accommodation form. [DE 46-20 at 82-86; DE 46-4 at 22; DE 46-5 at 4-5, 19-20, 27-30]. On the form, Giles checked a box indicating that medical documentation was not needed. [DE 46-4 at 22; DE 46-5 at 28-30]. Giles claims that she did so, not because medical information was not needed, but because Walter had not, then, provided any medical documentation. [DE 46-5 at 24-30]. Specifically, Giles testifies, "[i]t was asking for his need at that particular time for his request that he was asking, and I didn't have any paperwork or anything that he had given me to submit." [DE 46-5 at 28-29]. In addition, Giles claims that only the ADA coordinators at the home office had the authority to decide whether to request additional medical information from Walter. [DE 48-3 at 20-28; DE 46-5 at 24-30]. "[W]e can't make the determining factor; if any medical documentation will be needed. We get that response back from ADA, and they will let us know if it is anything needed upon their request." [DE 46-5 at 29].

Nevertheless, at the same time, Giles also had Walter sign a release of medical information, which authorized Wal-Mart to seek medical records from Walter's treating physician, Dr. Robert Pascuzzi, concerning Walter's medical condition. [DE 46-5 at 32-33; DE 46-6 at 15]. Wal-Mart contends that such information was necessary to determine an appropriate accommodation. [DE 46-5 at 44-45; DE 46-7 at 3; DE 46-8 at 7-8, 13-14; DE 46-9 at 5].

Thereafter, Walter continued to work as a Greeter and was temporarily permitted to use pink stickers to process returns. [DE 46-20 at 87; DE 46-5 at 17, 31].

9

On March 4, 2008, Nancy Woodley, Human Resource Coordinator for Wal-Mart's Accommodation Services Center, sent an e-mail to the Lafayette store requesting that Walter's health care provider complete a questionnaire regarding his condition. [DE 46-7 at 2-3, 5-6; DE 46-10 at 4]. On March 6, 2008, Training Coordinator, Morgan Miller ("Miller"), sent a fax to Dr. Pascuzzi's office, attaching the signed medical release and explaining that Wal-Mart needed information to determine what reasonable accommodations could be made in relation to Walter's disability. [DE 46-10 at 4-16; DE 46-11 at 3-5]. Accordingly, Miller requested that Dr. Pascuzzi review Walter's job description and complete a five- part medical questionnaire on Walter's behalf. [DE 46-10 at 4-16; 61-63; DE 46-11 at 3-5, 10]. When Dr. Pascuzzi's office did not respond to Miller's faxed request, Miller called the office and was informed that Walter needed to complete another form before Dr. Pascuzzi could complete the questionnaire. [DE 46-10 at 4-16]. Miller assumed that this meant another medical release form, but Miller did not inquire further with Dr. Pascuzzi's office or request that the form be sent to her or to Walter. [DE 46-10 at 4-16]. Thereafter, Miller did not receive any forms from Dr. Pascuzzi's office. [DE 46-10 at 4-16].

## March 18, 2008 Meeting

On March 18, 2008, Giles and Emerick met with Walter and claim to have placed Walter on a leave of absence. [DE 46-5 at 34-36, 41-42; DE 46-17 at 23]. Specifically, Wal-Mart claims that, during the meeting, Giles gave Walter a Leave of Absence packet and explained to Walter that he needed to have his doctor complete the Certification of Health Care Provider portion and return it to Wal-Mart within fifteen days. [DE 46-20 at 112-116; DE 46-5 at 18-19; DE 46-17 at 3]. In support, Wal-Mart presents a copy of Wal-Mart's Leave of Absence Checklist, allegedly completed on Walter's behalf on March 18, 2008 and signed by Personnel Manager, Sally Hedden. [DE 46-3

at 4, 6, 43].

Walter, however, presents a very different version of what transpired at this meeting. Although Walter recalls receiving a packet of medical paperwork at the meeting, Walter disputes ever being placed on a leave of absence. [DE 48-2 at 15-23; DE 46-4 at 23-24]. Instead, Walter claims that Giles told him at the meeting that he was being "let go" and informed him that he would need to reapply after returning the completed medical paperwork from his doctor. [DE 48-2 at 15-23; DE 46-4 at 23-24]. As such, Walter states that he thought that he was fired. [DE 48-2 at 15-23; DE 46-4 at 23-24].

Although Wal-Mart vigorously asserts that Walter was put on a leave of absence and not fired, pointing to the circumstantial evidence like the fact that Walter was not provided with an application during the meeting, *see e.g.* DE 46-1 at 11-12; DE 49 at 13-14; Wal-Mart notably points to no direct evidence in its briefs that explicitly refutes either of Walter's assertions: that Giles told him he was being "let go" or that Giles told him he would need "to reapply" after submitting the paperwork.

### **Walter and Wal-Mart's Subsequent Efforts to Obtain the Completed Forms**

Thereafter, Walter traveled to Dr. Pascuzzi's office in Indianapolis and requested that Dr. Pascuzzi complete the medical forms as soon as possible. [DE 48-2 at 17-22]. On March 25, 2008, Dr. Pascuzzi completed the medical questionnaire and certification form. [DE 46-4 at 31-35]. On April 1, 2008, Ashley Marlow, LPN, mailed the paperwork to Walter. [DE 46-4 at 37]. Shortly thereafter, Walter received the completed paperwork. [DE 48-2 at 17-22]. However, Walter did not return the forms to Wal-Mart. [DE 48-2 at 17-22]. Walter claims that he did not do so because he received the forms after the fifteen day time period set forth by Wal-Mart. [DE 48-2 at 17-22; DE

11

46-4 at 23-24]. Further, Walter asserts that, because he thought he had been fired, he believed that he only needed to return the forms if he decided to reapply to Wal-Mart. [DE 48-2 at 17-22; DE 46-4 at 23-24]. For instance, Walter claims,

> The leave of absence was not part of what I was told. I thought the paperwork information was irrelevant, because management told me that I [sic] was being "let go" and if paper work was filled out by my physician (who's a widely sought out specialist and who I only see once a year) I would need to reapply. Meaning to me I was terminated since management said I needed to reapply. Had management kept me employed, while paperwork was being processed from my physician their would be no issues, but to abruptly fire me because of my disability and my inability to use their new system was unfair.

DE 46-4 at 24. Finally, Walter contends that, by the time he received the paperwork, he was so emotionally bothered by what had happened to him that he did not want to reapply for his Greeter position. [DE 48-2 at 17-22; DE 46-4 at 23-24]. For example, Walter explains,

> I don't believe I provided it. Again, because that time period was up. But you know, I was–I was hit really bad emotionally and mentally at the time. So, I really didn't feel at all like I should try to reapply because I just felt disgusted.

[DE 48-2 at 20].

Meanwhile, on or around March 19, 2008, Miller left a message with Dr. Pascuzzi's office regarding the requested medical forms. [DE 46-4 at 37]. Additionally, on April 28, 2008, Miller sent a letter to Walter, reminding Walter that Wal-Mart had not yet received the ADA paperwork from Walter's doctor. [DE 46-10 at 25-26]. Therein, Miller provided another copy of the medical questionnaire and asked Walter to return the completed form to the Lafayette store. [DE 46-10 at 25-26]. However, in mid-May, Miller's letter was returned as "unclaimed", following two delivery attempts at Walter's home address. [DE 46-20 at 118; DE 46-19 at 2].

Around the same time, Walter filed for unemployment benefits; and, on April 1, 2008, Walter filed a discrimination claim against Wal-Mart with the E.E.O.C. [DE 46-14 at 6-16; DE 46-4

at 41]. These actions prompted Store Manager, Malcolm Bartram ("Bartram"), to send two certified letters to Walter, mailed on May 21, 2008 and May 22, 2008, explaining that Wal-Mart did not consider Walter to be terminated but rather on medical leave. [DE 46-14 at 6-16; DE 46-15 at 2; DE 46-3 at 6]. Therein, Bartram requested that Walter return the completed questionnaire by May 30, 2008 so that Wal-Mart could make a determination regarding his request for accommodation. [DE 46-14 at 6-16; DE 46-15 at 2]. On May 24, 2008, Walter received Bartram's letter. [DE 46-20 at 123-130; DE 46-4 at 38]. However, Walter claims that he never reviewed the letter, not even opening it, because, given his resulting emotional difficulties, Walter was "trying to move on, put it behind me." [DE 46-20 at 123-130].

### Wal-Mart Formally Terminates Walter's Employment

On June 30, 2008, Bartram consulted with Human Resources Manager Deb Briggs and an unidentified member of Wal-Mart's Accommodation Services Center and decided to terminate Walter's employment. [DE 46-14 at 17-26]. Bartram contends that he made the decision on account of Walter's failure to produce the requested medical documents that Wal-Mart needed to process his reasonable accommodation request. [DE 46-3 at 6; DE 46-14 at 4-5, 17-26; DE 46-15 at 4].

### III.  DISCUSSION

### COUNT I - FEDERAL CLAIMS OF DISABILITY DISCRIMINATION UNDER THE ADA

In its motion for summary judgment, Wal-Mart treats Count I of the Plaintiff's Complaint [DE 1 ¶¶ 31-36] as incorporating two separate allegations under the ADA: (1) failure to accommodate [DE 46 ¶ 2], and (2) disparate treatment [DE 46 ¶ 3]. The briefs submitted by both parties are consistent with this interpretation, and the language of the complaint supports it. [DE 1

¶ 32]. Accordingly, the Court construes Count I to incorporate both a failure to accommodate and a disparate treatment claim under the ADA, against both of which Wal-Mart has moved for summary judgment. As it turns out, both allegations are subject to the same failing. Because Walter has not presented evidence that would allow a reasonable jury to conclude that he is a "qualified individual with a disability" as defined by the ADA, summary judgment with respect to Count I - including both the failure to accommodate and disparate treatment claims incorporated therein - must be granted.

**A.**    **ADA Protects the Rights of a "Qualified Individual with a Disability"**

The Court construes Walter's Complaint as alleging both failure to accommodate and disparate treatment. In many ways the analysis for these two types of claims differs, but there is a common thread that binds them together. This is apparent in the Seventh Circuit's recent summary of the statutory grounds for each:

> Title I of the ADA prohibits employers from discriminating "against a *qualified individual with a disability* because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) [disparate treatment]. Title I also provides that an employer discriminates against a *qualified individual with a disability* by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A) [failure to accommodate].

*Serednyj v. Beverly Healthcare*, LLC., F.3d , 2011 WL 3800123 at *8 (7th Cir. 2011) (emphasis added). Accordingly, whether a plaintiff complains of a failure to accommodate or of disparate treatment, the plaintiff must show, as a threshold matter, that he is a qualified individual with a disability. *See also Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001) ("Once a plaintiff

14

has established that she is a qualified individual with a disability, [he] may show discrimination in either of two ways: by presenting evidence of disparate treatment or by showing a failure to accommodate."). A plaintiff who is not a qualified individual with a disability, as defined by the ADA, simply falls outside the protection of the statute. *See* §§ 12112(a), 12112(b)(5)(A).

Consistent with the foregoing, the Seventh Circuit incorporates the "qualified individual with a disability" element as a threshold requirement in the legal tests for each claim. To make a prima facie case for failure to accommodate, a plaintiff must typically show: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability. *Feldman v. Am. Mem'l Life Ins. Co.*, 196 F.3d 783, 789 (7th Cir. 1999). Similarly, the path of analysis for a disparate treatment claim has been stated thus:

> We have said a prima facie case of discrimination is established by showing that the plaintiff (1) is disabled within the meaning of the ADA, (2) is qualified to perform the essential functions of the job with or without accommodation, and (3) has suffered an adverse employment action because of his disability. *See, e.g., Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir.2004); *Dvorak v. Mostardi Platt Assocs., Inc.*, 289 F.3d 479, 483 (7th Cir.2002). The first two requirements are simply restatements of the statutory elements specifying that the plaintiff must be a "qualified individual with a disability" in order for the ADA to apply. 42 U.S.C. §§ 12102(2), 12111(8) (defining "disability" and "qualified individual with a disability"); 42 U.S.C. § 12112 (protecting "qualified individual with a disability" from discrimination on the basis of his disability). In other words, if a plaintiff cannot satisfy these requirements, he is not covered by the ADA. Once the plaintiff shows he is protected by the ADA, he can satisfy the third part of the test by showing, using the direct method or the indirect *McDonnell Douglas* approach, that he suffered an adverse employment action because of his disability. *See Hoffman*, 256 F.3d at 578 (Manion, J., dissenting); *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir.2001).

*Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006).

Plainly, then, Walter must show that he is a "qualified individual with a disability" to survive summary judgment, whether he hopes to do so through his failure to accommodate claim or his

disparate treatment claim. That determination involves a two-step process. First, Walter must show that he is an "individual with a disability." *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001). Next, Walter must demonstrate that he is a "qualified individual." *Id.*; *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998); *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 911 (7th Cir. 1996). The first is undisputed, and merits only brief discussion. The second is more problematic.

### 1.    Whether Walter is an Individual with a Disability

First, Walter must show that he is an "individual with a disability," as the term is defined by the ADA. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001). The term "disability" in the ADA means: (i) "a physical or mental impairment that substantially limits one or more major life activities of such individual"; (ii) "a record of such an impairment"; or (iii) "being regarded as having such an impairment[,]" meaning that "the individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both 'transitory and minor.'" 29 C.F.R. § 1630.2(g)(1)(i)-(iii). Walter has presented evidence showing that he has a disability as defined in subpart (i).[2] More specifically, Walter has Friedreich's Ataxia,

---

[2]  Proof of disability under subpart (i) involves three elements. *DePaoli v. Abbott Labs.*, 140 F.3d 668, 671 (7th Cir. 1998); 29 C.F.R. § 1630.2. First, a "physical or mental impairment" includes,
> [a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or [a]ny mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h). Second, "major life activities," include, but are not limited to,
> [c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working; and [t]he operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system.

29 C.F.R. § 1630.2(i). *See also DePaoli*, 140 F.3d at 671(summarizing 7th Circuit definitions of such activities to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working"). Third, the impairment must substantially limit the ability of an individual to

a degenerative neurological condition which substantially limits his ability to walk, stand, see, and speak. [DE 46-12 at 2, 4-6; DE 46-20 at 11, 25, 85, 149-55, 164]. Wal-Mart does not appear to contest that Walter's Friedreich's Ataxia qualifies as a disability under the ADA, and the Court considers the issue undisputed.

### 2.   <u>Whether Walter is a Qualified Individual</u>

Next, however, Walter must demonstrate that he is a "qualified individual" under the ADA. *Hoffman*, 256 F.3d at 572; *DePaoli*, 140 F.3d at 674; *Cochrum*, 102 F.3d at 911 (7th Cir. 1996). An individual is considered "qualified" if he can perform the essential functions of the employment position that he holds or desires, with or without reasonable accommodation.[3] 42 U.S.C. § 12111(8); *see also Gratzl v. Office of Chief Judges of 12th, 18th, 19th, and 22nd Judicial Cirs.*, 601 F.3d 674, 679 (7th Cir. 2010); *Jackson*, 414 F.3d at 812; *Hoffman*, 256 F.3d at 572; *DePaoli*, 140 F.3d at 674; *Cochrum*, 102 F.3d at 912. Walter, as plaintiff, is responsible for making the required showing: "[a]n ADA plaintiff bears the burden of proving that she is a 'qualified individual with a disability'- that is, a person 'who, with or without reasonable accommodation, can perform the essential functions' of her job." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *Weilar v. Household Fin. Corp.*, 101 F.3d 519, 524-25 (7th Cir. 1998) ("No matter the type of discrimination alleged - either disparate treatment or failure to provide a reasonable accommodation - a plaintiff must establish first that he was a qualified individual with a disability"). For the following reasons, the

---

perform a major life activity "as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). *See also Sears*, 417 F.3d at 797; *DePaoli*, 140 F.3d at 671-72; *Cochrum*, 102 F.3d at 911.

[3] The Court recognizes that the issue often also involves asking whether the employee had the "requisite skill, experience, and other job-related requirements for his position." *See Martin v. DeKalb Cnty. Cent. United Sch. Dist.*, 2005 WL 1869085 at *7 (citing *Ross v. Ind. State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir. 1998)). This issue does not appear to be disputed. More importantly, however, the Court need not address it. Walter's claim fails to survive summary judgment because he has not shown that he can perform the essential functions of the job in question with or without reasonable accommodation.

Court finds that Walter has not carried his burden.

The first task in assessing whether Walter could perform the essential functions of his position with or without reasonable accommodation is to determine what those essential functions were. Wal-Mart argues that helping customers with returns is an essential function of the Greeter position. In support, Wal-Mart points to the Greeter job description, which lists "provides requested assistance with merchandise returns" as one of the job responsibilities, and which cites "using fine motor skills, including grasping, turning, and manipulating while marking returned items" as an essential function. [DE 46-4 at 20]. Wal-Mart also highlights the testimony of Paul Askins, an Assistant Manager at the Fishers location, who estimated that Greeters spent somewhere between ten and twenty-five percent of their work time handling returned merchandise. [DE 48-5 at 13-14]. Most importantly, Wal-Mart further argues that utilizing the Telxon, in particular, to assist with returns is an essential requirement of the Greeter position at the Lafayette location. Wal-mart notes that, although the use of the Telxon was implemented after Walter was transferred to the Lafayette location, all Greeters at the Lafayette location are now required to use the Telxon, given its demonstrated success in preventing fraudulent returns. [DE 46-14 at 32; DE 46-16 at 2-3; DE 46-20 at 67, 75; DE 46-5 at 10-14; DE 46-3 at 5-7].

Wal-Mart's understanding of the Greeter job carries particular weight in the essential functions context. The Court gives significant deference – even a presumption of correctness – to an employer's judgment regarding which requirements of a particular job are "essential". 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3)(i) ("Evidence of whether a particular function is essential includes," *inter alia*, "the employer's judgment as to which functions are essential[;] written job descriptions[; and] the amount of time spent on the job performing the function"); *Gratzl*, 601 F.3d

18

at 679 ("We presume that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary"); *Jackson*, 414 F.3d at 811; *DePaoli*, 140 F.3d at 674 ("Although we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job"). Wal-Mart has presented a written job description demonstrating that handling returns - and exercising the fine motor skills involved in doing so - are essential functions of the Greeter position. Wal-Mart has also indicated that using the Telxon to process returns is an integral function, and that all Greeters at the Lafayette location are required to do so. These assertions are entitled to deference.

Walter argues in response that using the Telxon should be considered merely a method by which the actual essential function of processing returns is accomplished. To buttress his point, Walter stresses that after he told his supervisors he was having trouble using the Telxon to process returns, Wal-Mart temporarily allowed him to revert to the old sticker system. But the Court is not persuaded. Notably, Walter does not challenge Wal-Mart's assertion that the Telxon significantly reduced fraudulent returns, which were a serious problem under the previous sticker system. [*See e.g.* DE 46-20 at 54, 137-38 (Walter concedes that the sticker system resulted in significant theft and that Wal-Mart's transition to the Telxon was an "understandable" responsive effort)]. Rather, he appears to acknowledge that Wal-Mart reasonably changed the way it processed returns at the Lafayette location because the old method was no longer working.

The law in this regard is clear. An employee's job description is permitted to evolve, and "an employer is not required to maintain an existing position or structure that, for legitimate reasons, [the employer] no longer believes is appropriate." *Gratzl*, 601 F.3d at 680. That is just what has

occurred here. Wal-Mart had a legitimate problem with fraudulent returns, and upgraded return-processing equipment to combat that problem.[4] In light of the foregoing, and consistent with the deference the law instructs the Court to afford to Wal-Mart's understanding of which functions are essential to the performance of the Greeter job at its Lafayette location, the Court considers the use of the Telxon to process returns to be one of those essential functions.

Having reached that conclusion, the Court must next consider whether Walter has shown that he could perform the essential functions of the Greeter position with or without reasonable accommodation. It is undisputed that Walter cannot perform those essential functions - which include using the Telxon to process returns - *without* reasonable accommodation. The dispositive issue becomes whether Walter has shown that a genuine issue of material fact exists as to whether he can perform those essential functions *with* a reasonable accommodation. The Court finds that he has not.

Walter makes two arguments. First, Walter suggests that it would be a reasonable accommodation to allow him to continue to use the pink sticker system to process returns. But this argument hinges on Walter's previous contention that the use of the Telxon was not an essential function of Walter's job [DE 48 at 18], and this Court has decided otherwise. Given that, this argument is a non-starter. Being permitted to refrain from performing an essential function of one's job is obviously not a reasonable accommodation that allows one to perform the essential functions of one's job.

---

[4] The insufficiency of Walter's argument is perhaps best demonstrated by analogy: if a manufacturing plant were to upgrade production-line work stations with equipment that would demonstrably increase efficiency and output (both legitimate objectives), the fact that a given employee's work station was base-line functional using the *old* equipment would not disprove that using the *new* equipment had become an essential function of that employee's job.

Walter's second argument is that reassignment to another position within the store would have been a reasonable accommodation under the circumstances. This is a conceptually viable position. The ADA defines "reasonable accommodation" to include:

> **(B)** job restructuring, part-time or modified work schedules, *reassignment to a vacant position*, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B) (emphasis added). The case law confirms that an employer has a duty to "consider a reassignment to any position for which the employee satisfies the employer's legitimate, nondiscriminatory prerequisites, and for which the employee is capable of performing the alternative job's essential functions, with or without reasonable accommodations." *DePaoli*, 140 F.3d at 675 (citing *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 678 (7th Cir. 1998)). But there can be no such duty if no such job exists. *See Mays v. Principi*, 301 F.3d 866, 870 (7th Cir. 2002) ("The plaintiff cannot seek a judicial remedy for the employer's failure to accommodate her disability without showing that a reasonable accommodation existed"). Furthermore, "[i]t is the plaintiff's burden to show that a vacant position exists for which [he] was qualified." *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005) (citing *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001)); *see also Rehling v. City of Chicago*, 207 F.3d 1009, 1015-16 (7th Cir. 2000); *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1997).

To discharge that burden, Walter offers only the following:

Walter also proposed the option of reassignment. Although Wal-mart asserts in its Brief that there was no vacant position for which he was qualified, in fact, Giles, while sworn under oath, testified that she never even considered reassigning Walter to a different position nor did she know of anyone else who did. *Nevertheless, she*

21

> *testified that she was sure Walter would be a candidate for several positions in the store*. The option of reassigning Walter was ignored.

[DE 48 at 19 (emphasis added)]. Aside from the italicized phrase, this argument is off-point. Wal-Mart's failure to consider reassignment to a qualifying vacant position would tend to prove that Wal-Mart failed to reasonably accommodate Walter's disability *if* such a vacant position existed, but it does nothing to prove that one did.[5]

The italicized phrase is more on-point, but it is not enough to discharge Walter's burden. The Giles deposition passage Walter is referencing [*see* DE 48 at 12] states in relevant part:

> **[Plaintiff's Counsel]**: Do you know if there was any other position in the store for which John Walter would be a candidate?
>
> **[Giles]**: There are several positions in the store I'm sure he would be a candidate for, but there are processes in place that we have to follow in order for him to, you know sign up for. [*sic*].
>
> **[Plaintiff's Counsel]**: Can you name a few of those several?
>
> **[Giles]**: It depends on what he's interested in doing. We have what they call career preference and he would go into the computer system on the wire and go into his preference and checkoff [*sic*] things that he would be interested in doing. He never disclosed what his interests were to me, per se.

[DE 48-3 at 37]. The conversation continues, but no further relevant information is revealed.

There is not enough here for the Court to find that a reasonable jury could conclude that a

---

[5] In the interest of clarity, the Court elaborates. The test for establishing a *prima facie* case for failure to accommodate - one of Walter's claims - requires that a plaintiff show: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability. *Feldman*, 196 F.3d at 789. If Walter was able to show that he was a qualified individual with a disability under the first prong of the test (which in this case would require showing that a qualifying vacant position existed), and that Wal-Mart was aware of his disability under the second prong of the test, then the fact that Wal-Mart failed to consider transfer to the qualifying vacant position would tend to show that Wal-Mart did not reasonably accommodate Walter's disability under the third prong of the test. But the analysis cannot even reach that point if Walter is not a "qualified individual with a disability," and it is his burden to show that he is. Simply put, evidence that Wal-Mart made little effort to find a reasonable accommodation does not prove that a reasonable accommodation existed.

reasonable accommodation, in the form of reassignment to a qualifying vacant position, existed at the time in question. Putting aside for the moment the fact that the quoted exchange does nothing to satisfy the *DePaoli* definition of the range of jobs[6] an employer has a duty to consider, "[i]t is the plaintiff's burden to show that a *vacant* position exists for which [he] was qualified." *Jackson*, 414 F.3d at 813 (emphasis added). Nowhere in the excerpt above does Giles indicate whether any one of the hypothetical positions she references was vacant at the time in question. To the contrary, Giles testified moments earlier that she did not remember whether any open positions were available. [DE 48-3 at 35]. The Court recognizes that, in the summary judgment context, the record is viewed in the light most favorable to Walter, and that all reasonable inferences should be drawn in his favor. *Anderson*, 477 U.S. at 255; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). But neither this Court, nor a reasonable jury, could infer "yes, vacant positions were available," from "I don't recall at that time." [DE 48-3 at 35]. Furthermore, while not dispositive of the issue, Walter's own deposition testimony does not help his case. He appears to concede that no qualifying vacant positions were available during the relevant time period. [DE 46-20 at 141, 164].

The Court takes no position on whether, in some theoretical sense, Walter *could* show that a vacant position existed for which he was qualified. What matters is he has not done so here. As a result, this case is like *DePaoli*, which held: "[b]ecause [the plaintiff] did not propose *any* alternative job for which she satisfied [her employer's] prerequisites and whose essential functions she could perform, we conclude that [her employer] was entitled to summary judgment." 140 F.3d at 675. Neither has Walter identified any such job, and his succinct reference to Giles's ambiguous

---

[6] *See* 140 F.3d at 675 ("any position for which the employee satisfies the employer's legitimate, nondiscriminatory prerequisites, and for which the employee is capable of performing the alternative job's essential functions, with or without reasonable accommodations").

and uninformative conjecture on the topic, reproduced above, does not save his claim.

Walter has not shown that a reasonable jury could find in his favor on the issue of whether he was a "qualified individual with a disability." *Feldman*, 196 F.3d at 789. Accordingly, Walter has not met a threshold requirement that is common to both disparate treatment and failure to accommodate claims under the ADA. Summary judgment with respect to Count I - including both claims incorporated therein - must be **GRANTED.**

## <u>COUNT II - STATE CLAIM OF EMPLOYMENT DISCRIMINATION BASED ON DISABILITY</u>

Count II of Walter's complaint asserts a cause of action under the Indiana Civil Rights Law ("ICRL"). I.C. § 22-9-1-1 et seq. The ICRL was enacted to combat many types of discrimination, including disability discrimination. I.C. § 22-9-1-2; I.C. § 22-9-1-3(r). *Vanderploeg v. Franklin Fire Dept.*, 2000 WL 428646 at *2 (S.D. Ind. 2000). The ICRL establishes an administrative process through which claims of discrimination are investigated and prosecuted. I.C. § 22-9-1-6; I.C. § 22-9-1-11. *Vanderploeg*, 2000 WL 428646 at *2. Specifically, under the statute, the Indiana Civil Rights Commission ("ICRC") is empowered to conduct hearings and award relief in discrimination cases. I.C. §§ 22-9-1-6(i)-(k); I.C. § 22-9-1-11. *Vanderploeg*, 2000 WL 428646 at *2. The IRCL's administrative process can only be bypassed if both the party making the complaint and the party responding to it agree in writing to have the matter decided in a court of law. I.C. § 22-9-1-16; *Vanderploeg*, 2000 WL 428646 at *2; *Thomas v. Am. Family Mut. Ins. Co.*, 2008 WL 4911192 at *4 (N.D. Ind. 2008); *Montgomery v. Bd. of Tr. of Purdue Univ.*, 849 N.E.2d 1120, 1130 (Ind. 2006); *M.C. Welding and Machining Co., Inc., v. Kotwa*, 845 N.E.2d 188, 192 (Ind. Ct. App. 2006). Otherwise, the ICRL provides no private right of action. *Vanderploeg*, 2000 WL 428646 at *2.

As Wal-Mart points out, Walter has not alleged that the ICRC administrative process has been completed with respect to Walter's ICRL claim. [DE 46-1 at 25]. Further, Wal-Mart insists that it has never provided written consent to have Walter's ICRL claim adjudicated in court. [*Id.*]. Indeed, Walter appears to concede both points by failing to respond to Wal-Mart's arguments in his response brief. As a result, Walter has failed to establish a jurisdictional basis for this Court to hear his ICRL claim. I.C. § 22-9-1-16; *Vanderploeg*, 2000 WL 428646 at *3. Consequently, the Court must **DISMISS** Count II without prejudice for a failure of jurisdiction, pending either completion of the ICRL administrative process or proof that Wal-Mart has provided written consent for court adjudication of the claim.

### III. CONCLUSION

For the aforementioned reasons, the Court now disposes of Wal-Mart's motion for summary judgment [DE 46] as follows. The Court **GRANTS** summary judgment on Count I of Walter's complaint, including both the failure to accommodate and disparate treatment claims incorporated therein. The Court **DISMISSES** Count II of Walter's complaint without prejudice due to a failure to establish this Court's jurisdiction.

SO ORDERED.

ENTERED:   September 28, 2011

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court

25